# *IN THE SUPREME COURT, STATE OF WYOMING*

## 2016 WY 47

*April Term, A.D. 2016*

**May 11, 2016**

| | |
|---|---|
| BOARD OF PROFESSIONAL RESPONSIBILITY, WYOMING STATE BAR, | |
| Petitioner, | |
| v. | D-16-0001 |
| BRUCE S. ASAY, WSB # 5-1739, | |
| Respondent. | |

## ORDER OF PUBLIC CENSURE

[¶1]    **This matter** came before the Court upon a "Report and Recommendation for Public Censure," filed herein February 25, 2016, by the Board of Professional Responsibility for the Wyoming State Bar.  The Court, after a careful review of the Board of Professional Responsibility's Report and Recommendation, the "Affidavit of Costs and Expenses," the "Brief of Respondent, Bruce S. Asay," the "Wyoming State Bar's Response to Respondent's Objections to Report and Recommendation," the "Reply Brief of Respondent Bruce S. Asay," and the file, finds that the Report and Recommendation should be approved, confirmed, and adopted by the Court, and that Respondent, Bruce S. Asay, should be publicly censured for his conduct.  It is, therefore,

[¶2]    **ADJUDGED AND ORDERED** that the Board of Professional Responsibility's Report and Recommendation for Public Censure, which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

[¶3]    **ADJUDGED AND ORDERED** that Bruce S. Asay is hereby publicly censured for his conduct, which is described in the Report and Recommendation for Public Censure; and it is further;

[¶4]   **ORDERED** that, pursuant to Rule 25 of the Wyoming Rules of Disciplinary Procedure, Mr. Asay shall reimburse the Wyoming State Bar the amount of $7,026.42, representing the costs incurred in handling this matter, as well as pay the administrative fee of $750.00.  Mr. Asay shall pay the total amount of $7,776.42 to the Wyoming State Bar on or before August 31, 2016; and it is further

[¶5]   **ORDERED** that the Clerk of this Court shall docket this Order of Public Censure, along with the incorporated Report and Recommendation for Public Censure, as a matter coming regularly before this Court as a public record; and it is further

[¶6]   **ORDERED** that, pursuant to Rule 9(b) of the Wyoming Rules of Disciplinary Procedure, this Order of Public Censure, along with the incorporated Report and Recommendation for Public Censure, shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

[¶7]   **ORDERED** that the Clerk of this Court cause a copy of this Order of Public Censure to be served upon Respondent, Bruce S. Asay.

[¶8]   **DATED** this 11th day of May, 2016.

BY THE COURT:

/s/

**E. JAMES BURKE**
**Chief Justice**

IN THE SUPREME COURT
STATE OF WYOMING
FILED

FEB 2 5 2016

*Cal*

CAROL THOMPSON, CLERK

## BEFORE THE WYOMING SUPREME COURT

## STATE OF WYOMING

| | |
|---|---|
| *In the matter of* | ) |
| *BRUCE S. ASAY,* | ) |
| *WSB # 5-1739,* | ) |
| | ) *WSB No. 2015-007* |
| *Respondent.* | ) |

# D-16-0001

## REPORT AND RECOMMENDATION FOR PUBLIC CENSURE

**THIS MATTER** came on for hearing before the Board of Professional Responsibility on January 25 and 26, 2016, in Cheyenne, Wyoming, with Mark W. Gifford, Bar Counsel, appearing on behalf of the Wyoming State Bar and Respondent appearing in person and by and through his counsel, Stephen H. Kline. The Board, having heard the testimony of certain witnesses, having reviewed the exhibits received into evidence, having heard the arguments of counsel and being fully advised in the premises, FINDS and RECOMMENDS as follows:

### FINDINGS OF FACT

1.      Respondent is a member of the Wyoming State Bar, licensed to practice since 1980. He practices law in Cheyenne with other attorneys under the firm name Associated Legal Group, LLC (ALG).

2.      On January 20, 2015, Laramie resident Zack Koch ("Koch") submitted a complaint to the Office of Bar Counsel against Respondent who represented Koch in various matters relating to Koch's employment with the Hilton Garden Inn (HGI) in 2009 and his termination from that employment in December of that year.

3.      Koch worked in the construction trades for many years prior to taking employment in January of 2008 as Lead Engineer on the maintenance staff at HGI. A year after he began employment with HGI, Koch was passed over for a promotion to Chief Engineer. On

May 1, 2009, Koch filed a charge of age discrimination with the Wyoming Department of Employment.

4. On June 17, 2009, Koch and his wife met with Respondent for advice on how to proceed with the discrimination charge. Respondent testified that he advised Koch to maintain his employment and that it was better to be employed than have a lawsuit. Prior to the meeting at Respondent's office, Koch completed a "New Client Information Sheet" on which he provided contact information. Under "Reason for Visit," Koch wrote, "Advice on discrimination case." Koch signed the sheet as "Client" beneath the following small print:

> The Client will be billed monthly for costs and all Attorney's fees above the minimum fee. Full payment is due at the conclusion of the case or as agreed with Attorney. If not paid in full, the balance will be delinquent and will earn interest at the rate of 1/12% (sic) per month until paid in full. If the balance is not paid, Attorney may also request payment through use of a major credit card. The Attorney may file an action to compel payment of all amounts due to the Attorney under this contract. The Client, in the event such suit is filed, shall pay all costs of collection incurred by the Attorney including reasonable Attorney's fees and Court costs.

The Intake Form did not state an hourly rate or how costs were to be charged.

5. Consistent with the Intake Form, Respondent's first invoice to Koch, dated June 30, 2009, was for 1.9 hours spent on June 17, 2009, described as follows: "Review message; Meet w/ Mr. Z. Koch and review facts of complaint w/ Hilton; Review draft of response." That invoice, in the amount of $345.90, was paid on August 3, 2009. Respondent next invoiced Koch on August 31, 2009. That bill, in the amount of $281.78, consists of .4 hours for "Conf w/ Zack Koch about ongoing working conditions," and 1.2 hours "Meeting w/ client; Review documents; Prepare possible letter in response; T conf w/ client; Forward to client." Koch paid the bill September 29, 2009. Although the Kochs paid the first two bills, they did not make another payment for fees billed on an hourly basis.

6. Mr. and Mrs. Koch testified that at a meeting with Respondent in the summer of 2009, he agreed to handle all work on a contingency fee basis. Koch's wife testified that she

2

attended the meeting because of her concern about cost. She stated that Respondent told them that the case would be on a contingency basis and explained that "if we win, he gets paid and if we lose, he gets nothing." Respondent denied this and explained that Mr. Koch remained employed so he was not interested in taking the matter on contingency. Thereafter, Respondent represented Mr. Koch at a mediation with HGI in October, 2009 with the Wyoming Department of Employment that was not successful.

7. Mrs. Koch testified that they continued to receive bills and inquired of Respondent as to the reason. According to Mrs. Koch, Respondent stated that the bills were being generated to make a record, and that the fees would be collected from HGI if they prevailed.

8. On December 10, 2009, Koch was terminated by HGI. Koch contacted Respondent, and with Respondent's help, Koch thereafter filed another charge of discrimination with the Wyoming Department of Employment; this complaint was for retaliatory discharge.

9. After Koch was terminated, the billing statements sent by Respondent included interest charges added to the outstanding balance. This resulted in compounding the interest.

10. Koch also applied for unemployment compensation. Initially, the determination went in his favor and he began receiving monthly unemployment benefits. However, HGI objected to the initial determination and requested a contested case hearing. At this point, Koch contacted Respondent to assist with the hearing. A hearing before a hearing examiner was held on April 27, 2010 with Respondent appearing on behalf of Koch.

11. At this point Respondent continued to bill hourly for the employment advice and assistance in the hearing. By early May 2010, Koch's unpaid legal bills exceeded $5,000. The

parties did not discuss the fees due or those to be incurred. The parties did not discuss the potential recovery in the unemployment matter.

12. When the hearing examiner's decision went in favor of Koch, unbeknownst to Respondent, HGI demanded a hearing before the Employment Security Commission. Neither HGI nor the Commission provided notice of the appeal to Respondent, and neither Respondent nor Koch attended the hearing.

13. Without Koch or his counsel at its meeting on June 22, 2010, the Commission reversed the hearing examiner's ruling and determined that Koch was discharged for misconduct connected with his work. As a result, Koch's unemployment compensation stopped. Koch had to that point received $6,890 in benefits.

14. Upon being advised of the reversal of the award of unemployment benefits, Koch again contacted Respondent for assistance. Respondent contacted the Commission and raised the issue of lack of notice, but he was denied relief by the UIC. In July 2010, Respondent filed a Petition for Review in the Albany County District Court raising the procedural issue of the failure of the UIC or HGI to notify him of the appeal. The parties did not discuss fees or the potential recovery in going forward with the appeal.

15. Respondent continued to send monthly statements for his time. Although the parties did not discuss payment, one of the hearing exhibits before the Disciplinary Committee was a handwritten exchange between Respondent and his bookkeeper written on a printout of Koch's outstanding invoices dated June 4, 2010, at which time Koch's unpaid bill was $5,361.18. The bookkeeper wrote, "Bruce, This guy only paid the 1st and 2nd invoices sent to him totaling $627.68. No payments since then. Continue to send stmts?" Under the note is Respondent's handwritten answer: "Yes."

4

16. Respondent's partner at the time, Keith Burron, testified that Respondent often provided services without receiving full payment when a client "needed help".

17. On November 15, 2010, Respondent filed the petitioner's brief in the Albany County District Court seeking an order requiring the UIC to provide Koch an opportunity for a rehearing on the appeal.

18. By the end of 2010, Koch's unpaid legal bills exceeded $11,000, and were accruing finance charges at the rate of approximately $150 per month. Respondent stated that the bills were accurately prepared and that the interest was accurately computed as shown on the bills. Respondent did not pursue payment.

19. Respondent prepared and filed a reply brief in district court in January 2011. He requested a hearing on the petition.

20. On March 9, 2011, while the request for a hearing on the unemployment appeal was before the District Court, the Wyoming Department of Employment, Fair Employment Program, issued its determination on Koch's two discrimination charges. With respect to the original claim regarding age discrimination in being passed over for the Chief Engineer position, the hearing examiner found that there was no probable cause to support the claim. However, with respect to the retaliatory discharge claim, the hearing examiner found probable cause to believe that retaliation occurred as a result of Koch's filing of the age discrimination claim. The matter was referred to the EEOC. On June 17, 2011, the EEOC issued a Right to Sue Letter on both charges.

21. In the unemployment matter, the hearing on Respondent's Petition for Review in the unemployment compensation matter was held in late April 2011. In June 2011 the District Court reversed the Commission's decision and remanded the case for a new hearing. The order

5

on remand was entered in mid-July 2011, and the new hearing before the Commission was set for August 23, 2011.

22. On remand, the Commission again found in favor of HGI (finding again that Koch was terminated for misconduct connected with his work) and ordered no benefits paid. After discussions between Koch and Respondent, it was agreed that Respondent would proceed with another appeal on Koch's behalf. The parties did not discuss fees or any potential for recovery in going forward with the unemployment matter. Andy Losasso, the Deputy Administrator with the Wyoming Department of Workforce Services, testified that the total possible unemployment benefits that Koch could recover was $12,190. In other words, if successful, Koch would only be able to recover $12,190 less the $6,890 in benefits he had already received. Respondent testified that he did not think the amount of recovery was relevant.

23. By the end of August 2011, unpaid fees were $22,365.44 and finance charges were accruing at the rate of more than $300 per month.

24. In September 2011, the deadline to file a retaliatory discharge case loomed. Respondent requested to meet with Mr. and Mrs. Koch. Mrs. Koch wrote a $4,000 check to Respondent. Mr. and Mrs. Koch testified that this payment was required by Respondent to cover the costs of going forward with the discrimination and retaliatory discharge case (the "discrimination case"). Respondent disputed this and testified instead that if he was to proceed ahead with the case in Federal Court that he needed a payment by the Kochs toward the fees and costs associated with services and costs previously advanced by his office. The $4,000 payment was not described in any written agreement produced into evidence. Respondent did not recall any discussion with the Kochs concerning the outstanding invoices in the unemployment matter

6

or the two different "tracks" concerning his services (the unemployment case purportedly billed on an hourly basis and now the discrimination case taken on a contingency fee.)[1]

25.     Although the parties agree that the discrimination case filed in federal court was to proceed on a contingent basis, they dispute whether or not a written contingent fee agreement was prepared.   Respondent testified that he knew he had an obligation to have a written contingent fee agreement for the discrimination lawsuit and that he believed one was signed but has been misplaced.   Respondent, Keith Burron, and their paralegal all testified that Respondent's firm had a policy of never proceeding forward in a contingency fee case without a written agreement.  Koch denied that he ever saw such an agreement and none was produced.

26.     The $4,000 check contains Respondent's handwriting on the memo line indicating that the payment was for "lawsuit."  The $4,000 payment was deposited into Respondent's trust account on September, 2011.   At this time, the $4,000 payment was not applied to the outstanding fees and costs previously advanced by ALG.

27.     During the investigation of Koch's complaint, Bar Counsel posed the following question to Respondent:  "Mr. Koch says he paid you $4,000 to file the discrimination case.  Do you agree?  If so, how was that payment applied?" Respondent's counsel responded:

> Mr. Asay agrees that $4,000 was paid to the firm.  The payment was
> placed in the trust account and expenses including expert fees were applied

---

[1] The invoices issued prior to October 2011 had listed "Legal Services" under the description on the invoices.  After that time, the invoices for the unemployment appeal were described as "Appeal from UIC (Hourly)".  In Respondent's computer system, the federal court appeal was tracked and the invoices (while not sent) were described as "Federal Action Termination (Contingency)".

7

against it. After the close of the proceedings, on April 28, 2014, the balance was transferred to the operating account and applied against the fees owed.

28. On September 26, 2011, after consultation with his client, Respondent filed a second Petition for Review of the Commission's denial of unemployment compensation benefits in the Albany County District Court. There was no evidence that Respondent discussed outstanding fees or any potential recovery with Koch.

29. Initial disclosures were made in the discrimination case. One of the attorneys for HGI, Mitchell Edwards, testified at the hearing that it was only after the initial disclosures were produced that his firm realized that there was an arbitration provision in Koch's employee handbook. HGI filed a motion to amend its answer which Respondent objected to as untimely and inappropriate. On January 13, 2012, HGI filed a motion to stay the discrimination case and to compel Koch to seek arbitration pursuant to the HGI Employee Handbook provision.

30. Respondent testified that this was possibly the first time that he saw the complete employment handbook that Mr. Koch was given upon his employment with HGI although he had been provided at least portions of the handbook by Koch earlier in the unemployment case. Respondent testified he could have received it earlier and put it in a box. He would not have read the entire manual upon receipt. In any event, Respondent acknowledged that he did not have any conversation with Koch about the arbitration clause prior to the Motion to Compel Arbitration.

31. Ten days after HGI filed its January 13, 2012 motion to compel arbitration, Respondent filed an expert designation in the discrimination case consisting of a damage calculation prepared by a University of Wyoming economics professor.

32. Also during January 2012, Respondent prepared and filed Koch's brief in the Petition for Review before the District Court seeking review of the denial of unemployment

8

benefits. There was no testimony or evidence that the parties discussed the outstanding amounts owed or potential recovery in this matter at this time.

33. On March 14, 2012, Respondent sent the following email to Koch: "Attached is a Reply Brief that was filed in the Albany County District Court. It relates to the claim for Unemployment Insurance. On the other front, the Federal District Court is considering the arbitration issue and the remaining deadlines are suspended."

34. On March 27, 2012, the Albany County District Court Judge issued his decision letter affirming the Commission's denial of unemployment compensation to Koch. Respondent testified he filed a Notice of Appeal to the Wyoming Supreme Court in the unemployment compensation case because Koch requested that the matter proceed. Koch testified that he only did what Respondent advised at every juncture, and it didn't really matter to him because everything was being done on a contingent fee basis.

35. It appears from Respondent's records that on March 31, 2012, he transferred $905.64 from Koch's $4,000.00 in the ALG trust account to the ALG operating account in payment of an invoice for some costs. The expenses reimbursed included $700.00 paid to the expert economist, $36.49 for a FedEx charge that may have related to the unemployment case, and a couple hundred dollars for photocopies and postage. However, it did not include the $350.00 filing fee paid to the U.S. District Court for the discrimination case or the $50.00 payment to the Albany County Sheriff for service of process upon HGI. This left a balance remaining in trust for Koch's account of $4,000.00 − $905.64 = $3,094.36. The balance remained there until May of 2014.

36. On April 4, 2012 Judge Skavdahl of the US District Court issued an order granting HGI's motion to compel arbitration in the discrimination case. Respondent testified that

in his opinion this ended the federal case as Koch could not fund an expensive arbitration proceeding, particularly if he had to proceed in Michigan as he perceived was required by the arbitration provision. Respondent testified that after considering the potential cost of the arbitration, he met with Koch and they agreed to not proceed with the suit. In contrast, Koch testified that the last he knew, Respondent was going to find an arbitrator, although Koch acknowledged that he and his wife would not spend any more money on costs for an arbitrator.

37. As the appeal of the unemployment compensation claim worked its way through the Wyoming Supreme Court, the bill continued to grow. By October 2012, the bill exceeded $50,000 and was accruing finance charges at the rate of $800 per month.

38. The unemployment compensation claim would consume more than three years with Koch ultimately losing when on January 31, 2013, the Wyoming Supreme Court issued its opinion affirming Judge Donnell's decision upholding the denial of unemployment compensation to Koch. *See Koch v. Department of Employment,* 294 P.3d 888 (Wyo. 2013).

39. On March 11, 2013, HGI filed a motion to dismiss the discrimination case, citing Respondent's failure to comply with Judge Skavdahl's April 4, 2012 order that Koch was to initiate arbitration arrangements within 30 days. On March 13, 2013, Judge Skavdahl issued an order dismissing the discrimination case without prejudice for non-activity. At no time from April of 2012 through March of 2013 was there any written communication regarding a status update on the arbitrator or potential dismissal of the discrimination (retaliatory discharge) case.

40. On June 8, 2013, Respondent's office sent an invoice to Koch that contained the following handwritten note from Respondent: "Zack— This bill is very high. I don't expect you to pay it all but what arrangements can we make to resolve it." The amount of the invoice was

10

$57,318.04. There is no evidence that Koch responded. The evidence showed that this was Respondent's first effort to collect past due amounts.

41. On July 10, 2013, Respondent sent an email concerning the outstanding fees. On July 10, 2013 Respondent sent the following email to Koch under the subject line "Attorneys Fee Bill to Resolve": "We need to talk about the bill for attorney's fees, I have a partial offer to make to you but need to hear from you." Koch did not respond.

42. On October 22, 2013, Respondent sent another email with the same subject line: "Please give me a call to discuss." There is no evidence that Koch responded. Koch testified that he may have called Respondent's office but that Respondent was not available. Respondent testified that no calls were made by Koch to his office and that even in his absence he would have received a record of such a call.

43. On April 28, 2014, the balance of the Koch's funds in Respondent's trust account were transferred to the ALG operating account and applied against the fees invoiced. Respondent produced five invoices stamped "PAID 04/28/2014." These five invoices total $2,570.31. Respondent testified that as the case was completed, he would have authorized the bookkeeper to transfer the funds from the Trust Account as fees and costs were owed by Koch to Respondent. Respondent's bookkeeper applied the funds to the first fees accrued leaving costs still unpaid.

44. After he received an invoice from ALG dated 5/17/2014 in the amount of $63,447.60, Koch sent the following email to Respondent:

Mr. Asay,

I would like for you to stop sending bills to me. As per are conversation in your office my wife asked you what these two issues were going to cost? Your response and I quote. "If we win these cases I get paid, If we don't, then you (Zack & Sharon) owe me (Bruce) NOTHING! All you said you needed was, X

11

amount of money to get this going and we will go from there." We paid you the money you wanted to get started. We "LOST" and I OWE you NOTHING MORE. I'm tired of people who lie and then make it to be the TRUTH....in their own little Courtroom....! This is my ONLY and LAST communication on this matter.

45. Respondent responded on May 19, 2014:

Zach;

Your comments are inaccurate and misconstrue our conversations. You also could have responded earlier to my calls, notes and prior emails.

You had two cases ongoing. The one case related to your wrongful termination—which was dismissed. You also had a case on your claim for unemployment insurance. The first case was a contingency case and the latter was an hourly matter. In regard to the UIC case; there was a hearing, an appeal to the UIC, an appeal to the District Court and the Supreme Court. These were hourly matters and you were continually billed hourly.

As this is your last communication on the matter, I will get the opinion of the fact finder.

BSA

Thereafter, the parties continued to email their respective positions to one another. One email presented was sent July 10, 2014 by Respondent and stated in part:

If there is no agreement, I am prepared to proceed to collect on the debt. Attached is a form of complaint that has been prepared. As your wife participated in conversation relating to fees, I may or may not include her as a party. Again, I would like to resolve the matter but I need you to recognize that you were told from the outset that this is not a contingency case. Only the wrongful termination was treated in that matter. Your claim for unemployment compensation was on an hourly basis.

BSA

46. Things quieted down until Respondent sent another invoice, this one dated 12/15/2014 in the amount of $71,538.03. Koch had been in contact with an attorney from Utah and responded with the following email dated December 20, 2014:

Dear Mr. Asay;

You are fully aware of the fact that you have no signed retainer agreement.

You are also aware of the fact that I do not at any time agree to pay you an hourly rate for the work you agreed to handle on a contingency basis.

Pursuant to your email exchange last summer, please stop contacting and harassing me about your alleged and disputed bill.

Should I be contacted by you again for the services you mishandled on my behalf, I will file a formal complaint with the Wyoming State Bar asking that you be disciplined in the attached Ethical Violation Complaint Form.

Zack Koch
123 S. Colorado Ave.
Laramie, WY 82070

47.    Respondent responded the same day:

Zack;

I would like a resolution to this matter.

I understand that you are upset about being billed for the legal services that were provided to you. You called my office yesterday and yelled at my secretary about the billing. I would request that you not harass my staff and that you communicate directly with me. I am available to take your calls.

You understand my position. You came to my office seeking assistance and it was provided to you. You were aware of the services provided to you as we discussed your employment, then went to hearing, an appeal to the Unemployment Security Commission, the District Court, the UIC, the District Court and the Supreme Court. You did sign an agreement and it is attached. You note that it allows for monthly billing and the payment of interest for past due bills. As the bills accumulated, I even offered to have you do contract services for me that you declined.

As I have repeatedly stated, I would like to resolve this matter-particularly as the interest is onerous. You are welcome to give me a call.

BSA

The "signed agreement" to which Respondent refers is the "New Client Information Sheet" Koch signed during his June 17, 2009, initial meeting with Respondent. At some point, Respondent

13

offered to have Koch perform work on his property in Laramie. Koch testified that since he owed nothing any work would be an admission that money was owed.

48. The invoices received in evidence reflect that the hourly fee charged by Respondent increased. The increase was not communicated other than through the statements sent.

49. By the time Koch filed his grievance in January 2015, Respondent's bill had grown to over $71,000, inclusive of approximately $30,000 in finance charges billed at 1-1/2% per month. Respondent testified that the amount of recovery was not an issue for him, and that he did not know the amount of the potential recovery (while he represented Koch).

## CONCLUSIONS OF LAW

1. Rule 1.1 Competence states: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

Bar counsel alleged that a competent lawyer would not incur a $70,000 bill on an unemployment compensation case. In addition, Respondent filed the case without doing the basic, due diligence of obtaining a copy of Koch's personnel file from HGI. Had he done so, he would have been aware of the compulsory arbitration provision.

The BPR determined that there was no violation of Rule 1.1 proven by clear and convincing evidence.

2. Rule 1.3 Diligence states: "A lawyer shall act with reasonable diligence and promptness in representing a client."

Bar counsel alleged that as indicated above, Respondent apparently failed to obtain a copy of Koch's personnel file from HGI, or to read it if he obtained it, a basic measure that

14

would have alerted him to the mandatory arbitration provision. In addition, there were several instances in which Koch had to remind his lawyer of impending deadlines. * * * Respondent waited until the day the expert designation was due in the discrimination case to have a substantive communication with the expert economist, and filed a half-done report. Though ordered by Judge Skavdahl to make arbitration arrangements within 30 days of the April 4, 2012, order compelling arbitration, the record is devoid of any activity in the case until March 11, 2013, when HGI moved to dismiss the case. When Judge Skavdahl ordered the parties to arbitration, Respondent still had more than $3,000.00 of Koch's money in his trust account. Thus, there were significant resources on hand that could have gone to pay for an arbitrator. Moreover, rather than refund that money when, according to Respondent, the decision was made to let the discrimination lawsuit die, Respondent waited for more than a year and then transferred those funds to the ALG operating account in May 2014.

The BPR determined that there was no violation of Rule 1.3 proven by clear and convincing evidence.

3. Rule 1.4. Duty to Communicate

Rule 1.4 Communication, in relevant part provides:

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstances with respect to which the client's informed consent, as defined in 1.0(f), is required by these Rules;

(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

(3) keep the client reasonably informed about the status of the matter

15

As to this Rule, Bar Counsel alleged: "Respondent failed in his duty to communicate his fee arrangements clearly to Koch, and further failed to keep Koch informed of the status of the discrimination case."

The Comment Section to Rule 1.4 states:

> Explaining Matters-[6] The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued; to the extent the client is willing and able to do so. Adequacy of communication depends in part on the kind of advice or assistance that is involved. For example, when there is time to explain a proposal made in a negotiation, the lawyer should review all important provisions with the client before proceeding to an agreement. In litigation a lawyer should explain the general strategy and prospects of success and ordinarily should consult the client on tactics that are likely to result in significant expense or to injure or coerce others.

In summary, there was much confusion as to the fees and costs to be charged and that were charged. At hearing Respondent acknowledged that communication as to the fee could have been better. Respondent throughout his representation of Koch did not consult with Koch as to the significant expense in the various appeals. The hourly fee initially charged by Respondent and then later increased was not clearly communicated. No effort was made to discuss or collect outstanding amounts that could have provided an early opportunity to detect any issue as to the fee arrangement.

Further, Respondent did not communicate with Koch about the status of the discrimination case after the April 2012 meeting to discuss Judge Skavdahl's ruling, other than to send statements.

Based on the foregoing, the Board found clear and convincing evidence of a violation of Rule 1.4.

16

4. <u>Rule 1.5. Fees</u> states, in part: "(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount of expenses." The factors to be considered in determining the reasonableness of a fee include the following:

\* \* \*

(4)    the amount involved and the results obtained;

(5)    the time limitations imposed by the client or by the circumstances;

(6)    the nature and length of the professional relationship with the client;

(7)    the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)    whether the fee is fixed or contingent.

Bar Counsel alleged, "In running up a $40,000 bill in an unemployment compensation matter and tacking on more than $30,000 in finance charges, Respondent violated this rule."

In summary, at the hearing, it was Respondent's position that a client can authorize legal work that generates charges in excess of the monetary amount that might be recovered from the other side. However, Respondent acknowledged that he did not determine what the potential recovery might have been and did not discuss with Mr. Koch the potential recovery at any time. Respondent did not have this discussion even though Respondent knew his client was unemployed. Although aware that Koch had sold his business previously, Respondent did not know his client's financial condition. Continual addition of interest without clearly communicating the fee arrangement resulted in Respondent charging an unreasonable fee given the circumstances present. The Board finds clear and convincing evidence of a violation of Rule 1.5(a).

5. Rule 1.5(b) states: "The scope of representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client,

17

preferably in writing, before or within a reasonable time after commencing the representation ***."

Bar Counsel alleged that Respondent failed to comply with this portion of the rule. The Comment on "Basis or Rate of Fees" states:

> In a new client-lawyer relationship, however, an understanding as to fees and expenses must be promptly established. Generally, it is desirable to furnish the client with at least a simple memorandum or copy of the lawyer's customary fee arrangements that states the general nature of the legal services to be provided, the basis, rate or total amount of the fee and whether and to what extend the client will be responsible for any costs, expenses or disbursements in the course of the representation. A written statement concerning the terms of the engagement reduces the possibility of misunderstanding.

In summary, the Client Intake Form did not disclose the hourly fee or how costs were to be paid. The amounts owed, were set out in written monthly statements which were sent to Koch for many years. The statements reflect an increase in the hourly fee that was not communicated to Koch beyond inclusion in the statements. The $4,000 collected and then taken for fees and certain costs by Respondent was not explained to Koch. Based upon the Findings of Fact by the Board, it finds by clear and convincing evidence a violation of Rule 1.5(b).

6.  Rule 1.5(c) states:

> (c)  A fee may be contingent on the outcome of the matter for which the services is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

18

Bar Counsel alleged: "Although Respondent contends there was [a written contingent fee agreement], Koch denies ever seeing one and none has been produced." Of interest to this matter is the Comment Section: "it is proper to define the extent of services in light of the client's ability to pay."

As to the allegations in regard to Rule 1.5(c), Respondent acknowledged that he was required to have a written contingency fee agreement and that he has been unable to locate one. Despite representation that it was a contingency matter, fees and costs were taken out of Respondent's trust fund.[2] Based upon the Findings of Fact by the Board, it finds by clear and convincing evidence a violation of Rule 1.5(c).

7.      Rule 1.15. Trust Accounts. states, in part:

(d)      A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance. The lawyer may withdraw those funds only as fees are earned or expenses incurred.

(e)      Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property. Complete records of such accounting shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(f)      When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property in dispute shall be kept in trust by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

Bar Counsel alleged: "Respondent violated this rule when he transferred the balance of the $4,000.00 paid by Koch from the ALG trust account to the ALG operating account and applied it to legal fees, contrary to the parties' agreement regarding the use of those funds."

---

[2] The Board notes that Mr. and Mrs. Koch have no claim or expectation of return of any funds from Respondent.

In summary, the funds provided by the client were to be held in trust for the payment of fees and costs were placed in the firm trust account and an accounting was maintained of the funds. Respondent testified that when his bookkeeper brought the balance to his attention, he believed that he was owed significant fees from the unemployment matter as well as costs from both cases. There was no written explanation presented as to how the $4,000 was to be used other than the note on the check "lawsuit." At the time the balance in trust was transferred, the discrimination case was dismissed. Based upon the Findings of Fact, the Board determined there was clear and convincing evidence of a violation of Rule 1.15.

8. <u>Rule 4.4. Respect for Rights of Third Persons.</u> states, in part: "(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."

Bar Counsel alleged: "Respondent violated this rule when he threatened to include Koch's wife as a defendant in a collection action for Koch's legal fees."

The BPR determined that there was no violation of Rule 4.4 proven by clear and convincing evidence. The email was to Koch and not his wife.

9. <u>Rule 8.4(c). Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation.</u> states, in part: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation". Early in Bar Counsel's investigation, Respondent was requested to produce copies of all billing statements and copies of written communications with Koch, including any emails, and some of the requested documents appear to have been initially omitted.

20

The BPR determined that there was no violation of Rule 8.4 (c) proven by clear and convincing evidence.

## DETERMINATION OF THE APPROPRIATE DISCIPLINE

1.      Rule 15(b)(3)(D) of the Wyoming Rules of Disciplinary Procedure provides that in imposing a sanction after a finding of misconduct by the respondent, the BPR shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions (the "ABA Standards"):

(i)    Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;

(ii)   Whether the lawyer acted intentionally, knowingly, or negligently;

(iii)  The amount of the actual or potential injury caused by the lawyer's misconduct; and

(iv)   The existence of any aggravating or mitigating factors.

The First Factor:  The Duty Violated

2.      Respondent's violation of Rule 1.4 falls within ABA Standard 4.4, "Lack of Diligence":

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving failure to provide competent representation to a client:

4.41   Disbarment is generally appropriate when:
(a)    a lawyer abandons the practice and causes serious or potentially serious injury to a client; or
(b)    a lawyer knowingly fails to perform services for a client and causes injury or potentially serious injury to a client;
(c)    a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

4.42   Suspension is generally appropriate when:
(a)    a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or
(b)    a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

21

4.43     Reprimand [i.e., "public censure" under Rule 9(a)(3) of the Wyoming Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.

4.44     Admonition [i.e., "private reprimand" under Rule 9(a)(4) of the Wyoming Rules of Disciplinary Procedure] is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client.

3.     Respondent's violation of Rule 1.4, which relates to his failure to effectively and timely communicate with Koch regarding fee arrangements and Respondent's expectations regarding payment of those fees over a period of several years, rises to the level of a "pattern of neglect" which caused "injury or potential injury" to Koch.

4.     Respondent's violations of Rule 1.5 fall within two ABA Standards, 4.6 ("Lack of Candor") and 7.0 ("Violation of Other Duties Owed as a Professional"). ABA Standard 4.6, which appears under the broad heading, "Violation of Duties Owed to Clients," provides:

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases where the lawyer engages in fraud, deceit, or misrepresentation directed toward a client:

4.61     Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potential serious injury to a client.

4.62     Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to a client.

4.63     [Public censure] is generally appropriate when a lawyer negligently fails to provide a client with accurate or complete information, and causes injury or potential injury to the client.

4.64     [Private reprimand] is generally appropriate when a lawyer engages in an isolated instance negligence in failing to provide a client with accurate or complete information, and causes little or no actual or potential injury to the client.

5.     ABA Standard 7.0, "Violations of Other Duties Owed as a Professional," provides:

22

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving false or misleading communication about the lawyer or the lawyer's services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, unreasonable or improper fees, unauthorized practice of law, improper withdrawal from misrepresentation, or failure to report professional misconduct.

7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public or the legal system.

7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.

7.3 [Public censure] is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.

7.4 [Private reprimand] is generally appropriate when a lawyer engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.

6. In applying Standard 4.6 and 7.0 to Respondent's violation of Rule 1.5, the Board finds that Respondent knowingly engaged in charging an unreasonable fee to Koch in violation of Rule 1.5(b); in particular, the monthly assessment of a 1-1/2% finance charge, compounded monthly was not reasonable under the circumstances. The Board further finds that Respondent's violations of Rule 1.5(a) and (c) were negligent under both standards.

7. Respondent's violation of Rule 1.15 falls within Standard 4.1, "Failure to Preserve the Client's Property":

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases where the lawyer engages in fraud, deceit, or misrepresentation directed toward a client:

4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

23

4.12. Suspension is general appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

4.13 [Public censure] is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

4.14 [Private reprimand] is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.

8. The Board finds that Respondent's conduct in applying the $4,000.00 payment to anything other than costs incurred in the retaliatory discharge action was a violation of Rule 1.15. Because of Respondent's lack of diligence in clearly communicating the fee arrangements, it is difficult to determine if Respondent knew or should have known that he was dealing improperly with client property when he applied the $4,000 to fees and finance charges billed by Respondent several months prior to the payment. However, given the timing of the transfer and that Respondent wrote the word "lawsuit" on the "for" line of the $4,000.00 check, the Board finds that Respondent knew or should have known that he was dealing improperly with the $4,000.00 payment when he directed his staff to apply the funds to prior billing statements.

The Second Factor: The Lawyer's Mental State

9. The preamble to the ABA Standards includes the following discussion regarding mental state:

> The mental states used in this model are defined as follows. The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence, when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation of a care that a reasonable lawyer would exercise in the situation.

24

10.     As stated previously, the Board finds that Respondent acted with knowledge in conduct found by the Board to be a violation of Rules 1.5(b) and 1.15. The Board finds that Respondent acted with negligence in conduct found by the Board to be a violation of Rule 1.4, 1.5(a) and (c).

The Third Factor: The Potential or Actual Injury Caused by the Lawyer's Misconduct

11.     Under the ABA Standards, "injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." "Potential injury" is defined as "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct."

12.     The Board finds that Respondent's conduct was the cause of potential injury to Koch in that Respondent charged unreasonable fees and threatened to sue Koch over the fees.

The Fourth Factor: The Existence of Aggravating or Mitigating Factors

13.     ABA Standard 9.0, entitled "Aggravation and Mitigation," provides as follows:

9.1     *Generally*

After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.

9.2     *Aggravation*

9.21    *Definition.* Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.

9.22    *Factors which may be considered in aggravation.* Aggravating factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of the victim;

(i) substantial experience in the practice of law;

(j) indifference in making restitution; and

(k) illegal conduct, including that involving the use of controlled substances.

9.3    *Mitigation*

9.31    *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

9.32    *Factors which may be considered in mitigation.* Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure of disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when:

    (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

    (2) the chemical dependency or mental disability caused the misconduct;

    (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

    (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings;

26

(k) imposition of other penalties or sanctions;

(l) remorse; and

(m) remoteness of prior offenses.

14.    The Board finds the following aggravating factors:  multiple offenses as to this one client, and substantial experience in the practice of law.

15.    The Board finds the following mitigating factors: absence of a prior disciplinary record, absence of a dishonest or selfish motive, and good character or reputation.

## RECOMMENDATION

In consideration of the foregoing, the BPR recommends that a public censure be issued to Respondent for violations of Rule 1.4, Rule 1.5(a)(b) and (c), and Rule 1.15; that he be ordered to pay an administrative fee of $750; and, that he pay costs in the amount of $7,026.42 as provided in Rule 25 of the Wyoming Rules of Disciplinary Procedure.

DATED this _22nd_ day of February, 2015.

Judith Studer, Chair
Board of Professional Responsibility